J-S24031-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INT. OF: K.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.M.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 213 WDA 2025 |

Appeal from the Order Entered January 27, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000031-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: K.B., MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF:  T.M.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 280 WDA 2025 |

Appeal from the Order Entered January 27, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000032-2023

BEFORE:  NICHOLS, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY LANE, J.:                    **FILED:  September 4, 2025**

T.M.S. ("Mother") appeals from the orders terminating her parental rights to her children, K.S., born in January 2016, and K.B., born in March 2019 (collectively, "Children").  We affirm.

On May 1, 2017, the Allegheny County Office of Children, Youth, and Families ("CYF") received a report that Mother, who was sixteen at the time and was living with her mother ("Maternal Grandmother"), "was on the run

with" one-year old K.S. N.T., 6/7/24, at 142. CYF obtained an emergency custody authorization ("ECA") the following day and placed K.S. in the care of Maternal Grandmother. The Court of Common Pleas of Allegheny County, Juvenile Division ("Juvenile Court") adjudicated K.S. dependent on November 8, 2017, and she has not returned to the care of Mother or her father, T.H., since that date.

In February 2018, Mother again absconded from Maternal Grandmother's home with K.S., and CYF obtained a second ECA for K.S. After Mother and Maternal Grandmother tested positive for controlled substances, CYF placed K.S. with a maternal aunt. During the same month, the Juvenile Court adjudicated Mother dependent and placed her in a residential home. In September 2018, Mother's aunt informed CYF that she could no longer care for K.S., and CYF placed K.S. in a non-kinship foster home.

Mother gave birth to K.B. in March 2019. K.B. tested positive for THC at the time of birth. After returning from the hospital, Mother, K.B., and K.B.'s father, J.B., lived for a short period with J.B.'s cousin. CYF obtained an ECA for K.B. in April 2019 and placed her in the care of J.B.'s great aunt and uncle ("Paternal Aunt and Uncle"). CYF also placed K.S. in Paternal Aunt and Uncle's care in July 2019. The Juvenile Court adjudicated K.B. dependent on March 4, 2020, and she has not returned to the care of Mother or J.B. since that date.

Mother and J.B. resided with Children at Paternal Aunt and Uncle's home until August 2020, when they moved into an apartment in Washington County.

Paternal Aunt and Uncle were unable to provide long-term care for Children due to their advanced age and health concerns. Therefore, on June 6, 2022, CYF moved Children to a non-kinship, pre-adoptive foster home. Children remained in that foster home through the date of the hearings.

On February 23, 2023, CYF filed petitions to terminate Mother's parental rights to Children.[1] The Orphans' Court conducted hearings on the petitions on June 7, July 12, and September 24, 2024, and January 7 and 23, 2025.[2] The following individuals testified at the hearings: CYF Caseworkers Theresa Holmes ("Holmes") and Sherri Ihrig ("Ihrig"); Rachel Wagner ("Wagner"), an employee of the Pennsylvania Organization for Women in Early Recovery ("POWER"); Tayle Grace ("Grace"), a foster care coordinator at Wesley Family Services; Pamela Johnson, an employee of A Child's Place; Eric Bernstein, Psy.D. ("Dr. Bernstein"), an expert in child psychology; Paternal Aunt; and

---

[1] CYF also sought the termination of T.H.'s and J.B.'s parental rights to Children. T.H. and J.B. did not contest termination, and the trial court terminated their parental rights in the orders under appeal. T.H. and J.B. did not file notices of appeal from the orders.

[2] The Orphans' Court appointed Children's guardian *ad litem* in the dependency matters to also serve as their legal interest counsel in the termination matters, finding that there was no conflict between Children's best interests and legal interests. **See** Orders, 4/5/23; **see also** Orders, 3/12/24; N.T., 4/5/23, at 6; **In re Adoption of K.M.G.**, 240 A.3d 1218, 1235 (Pa. 2020) (holding that, where Orphans' Court appoints same person to serve as legal interest counsel and guardian *ad litem*, "appellate courts should review *sua sponte* whether the [O]rphans' [C]ourt made a determination" that the child's legal interests and best interests "did not conflict").

Mother, who was twenty-three years old at the time of the hearings. The evidence presented at the hearings revealed as follows.

Mother's court-ordered goals were to address and maintain sobriety; maintain employment; obtain adequate housing; participate in mental health therapy; work with in-home services; complete a parenting class; address and attend intimate partner violence ("IPV") counseling; and attend visits with Children. CYF invited Mother to attend periodic family plan meetings to discuss her court-ordered goals, but she did not consistently attend those meetings.

CYF ordered Mother to address substance abuse issues based upon her history of marijuana use. In 2019, Mother completed an initial assessment with POWER, who recommended that Mother complete a dual-treatment program for substance abuse and mental health. When Mother resided in Washington County, POWER referred her to a program through Wesley Spectrum, but she did not engage with that provider. The Juvenile Court ordered Mother to engage in drug screens in February 2018, but CYF has been unable to obtain screens from Mother except when she has been present in court. When Holmes worked on Mother's case from May 2017 to April 2023, she did not receive verification that Mother achieved sobriety.

CYF referred Mother to POWER again in December 2023, and POWER made numerous attempts to contact Mother but was unsuccessful. POWER closed the referral in January 2024 and received a final referral for Mother in March 2024. Mother engaged in a telephone screening but did not attend an

in-person assessment interview. POWER closed that that referral in April 2024. Following Wagner's testimony at the June 7, 2024 hearing regarding POWER's efforts to enroll Mother in a dual-treatment program, Mother contacted POWER in September 2024. Mother tested positive for THC during her initial session with POWER at that time. Ihrig, who worked on the case as the adoption case study caseworker from November 2022 and the direct service caseworker beginning in April 2023, testified that POWER recommended in September 2024 that Mother attend mental health treatment. Mother did not accept a case manager or referral from POWER. Ihrig testified that Mother did not provide CYF with proof that she engaged in mental health treatment.

The Juvenile Court ordered Mother to engage in in-home services to address parenting, budgeting, mental health, community resources, IPV, housing, and becoming self-sufficient. CYF referred Mother for in-home services on two occasions, but both times the service provider closed the referral due to difficulty engaging with Mother and her failure to attend appointments consistently. CYF also referred Mother to a Washington County independent living services program, but the provider closed the service as a result of Mothers' failure to engage.

Although Mother had the opportunity to complete a parenting class through her in-home services, she did not do so. In 2021, Mother provided a certificate showing that she completed an online parenting program. However, CYF determined that the online program was insufficient and

referred her to the Triple P Parenting program through A Child's Place. Mother enrolled in the program twice, in September 2022 and February 2023, but did not finish the ten-session program on either occasion. Mother contacted A Child's Place again in May 2024, but she did not "start engaging" until September 2024. N.T., 1/7/25, at 13. Johnson testified that, while there were initially "a series of no-shows" by Mother, she participated in the Triple P Parenting program when "things started to get really heated" in the termination matter. *Id*. at 58, 69. Mother completed the program in December 2024. *Id*. at 82.

Regarding Mother's employment and housing goals, Holmes testified that Mother "had jobs" during the history of the case but not "consistent employment." N.T., 6/7/24, at 124. Holmes was only aware that Mother had stable housing when she was renting an apartment with J.B. in Washington County in 2020. However, by October 2021, CYF could not verify Mother's residence. According to Ihrig, Mother was homeless as of the date of her testimony on January 7, 2025. At family plan meetings, Ihrig provided Mother with lists of apartments to rent and homeless shelters and encouraged Mother to contact those resources. Mother also received housing resource information during the Triple P Parenting program.

At the conclusion of a May 2021 visit with Children, Mother had an argument with J.B. and threw an object that broke a window. CYF referred Mother for IPV counseling in July 2021. Holmes testified that Mother did not engage in counseling at that time, and the provider closed the referral. CYF

referred Mother two more times for IPV counseling, but the provider closed the referrals on those occasions as well, due to lack of engagement. However, Ihrig stated that Mother began attending IPV counseling in July 2024 and she had recently progressed from one-on-one to group virtual sessions.

The Juvenile Court ordered Mother to attend visits with Children after she and J.B. moved into an apartment in August 2020. Mother was at first inconsistent with visits, but visits became more regular in November 2020, and by Christmas of that year, CYF permitted Children to have unsupervised overnight visits with Mother. However, Mother's attendance at visits again became sporadic. The IPV incident occurred during a visit in May 2021, and by June 2021, the visits returned to supervised. Since that time, Mother has remained inconsistent in visitation with Children. Grace, Children's foster care coordinator, testified that Mother attended only seventeen of one hundred offered supervised visits between June 2022 and June 2024. CYF filed an application for a finding of aggravated circumstances based upon Mother's inconsistent visitation, which the Juvenile Court granted on October 4, 2023.[3] *See* 42 Pa.C.S.A. § 6302 (providing that aggravated circumstances exist when a parent has "failed to maintain substantial and continuing contact with the child for a period of six months"). Additionally, upon a motion by Children's

---

[3] Ihrig testified that, notwithstanding the aggravated circumstances finding, "at some later time" the Juvenile Court ordered CYF to continue reasonable efforts towards reunification. N.T., 1/7/25, at 18.

guardian *ad litem*, the court suspended Mother's visits in October 2024, following an incident during a visit.

The testimony at the hearings indicated that Children have thrived in their current, pre-adoptive foster home. Holmes testified that Children's transition to the foster home "went very well" and Children were "happy and comfortable" there. N.T., 7/12/24, at 10. Children and the foster parents were affectionate towards each other. Holmes stated that the foster parents were meeting Children's needs, and Mother was not attending medical visits or school appointments. Ihrig testified that Children "look to [the foster parents] as their parents" and "act like a family" together. N.T., 1/7/25, at 19. Ihrig similarly stated that the foster parents attend to Children's medical and educational needs, while Mother has no current parenting responsibilities relative to Children. Grace testified that Children love residing in the foster home, which they share with a younger sibling. Grace stated that there is mutual affection between the foster parents and Children. After the foster parents sought out behavioral therapy for K.S., Grace has seen positive improvements in K.S.'s behavior.

Holmes testified that Mother and Children appeared bonded during the visits she supervised. Grace testified that Mother and Children "really bonded well" during the early visits she observed after Children's placement in the current foster home. N.T., 6/7/24, at 38. However, Grace noticed negative reactions by Children when Mother did not attend visits. In particular, K.B.

"would have tantrums and outbursts" when Mother confirmed a visit but then failed to appear. *Id*.

Dr. Bernstein completed two individual evaluations of Mother and an interactional evaluation of Children with their foster parents. During the individual evaluations, Mother took only limited responsibility for her situation, indicating that she was a "victim of the system" and that CYF "failed" her. *Id*. at 90, 93. Mother discussed her history of suicidal ideation, self-harm, and IPV incidents. Mother appeared "low in energy and mood" at the evaluations, and she left the second evaluation early due to illness. *Id*. at 92. Dr. Bernstein diagnosed her as suffering from major depressive disorder, severe, without psychotic features. He recommended that she engage in crisis services, psychiatric therapy, and medical management.

Dr. Bernstein observed that the foster parents provided a stable and secure environment for Children. While K.S. was initially less comfortable than her sister during the evaluation, she eventually became more at ease and playful like K.B. Children used "titles [that were] some derivation of mother and father for the foster parents." *Id*. at 96. Dr. Bernstein supported the foster parents as a permanency resource for Children. He opined that Children shared a secure and healthy bond with the foster parents. He further stated that the foster parents provide Children with "supervision, attention, support, love, care, affection, discipline, structure, stimulation, learning[, s]ocial interaction, sleep, basic hygiene" and the "myriad" other needs children have. *Id*. at 100-01.

Dr. Bernstein also intended to perform an interactional evaluation of Mother and Children; however, he was unable to complete that evaluation due to Mother failing to attend three scheduled appointments. Therefore, Dr. Bernstein was unable to offer an opinion regarding Mother's bond with Children. However, he stated that Mother's attendance at only seventeen of one hundred offered visits constituted a "substantial absence" from Children's lives. *Id*. at 135 He further explained that when a parent "inconsistently participates in the child rearing and is absent for prolonged periods without explanation," the child may experience stress, and the existing parent-child bond will weaken. *Id*. at 99.

Paternal Aunt testified that, when Mother resided with her and Children prior to August 2020, Mother took care of all the childcare responsibilities and Paternal Aunt "did not have to do anything." N.T., 1/7/25, at 92. Paternal Aunt stated that Mother was a "good mother." *Id*. at 96. Paternal Aunt admitted that Mother attended only one visit during the last six to eight months Paternal Aunt cared for Children. In addition, Paternal Aunt stated that she had not witnessed Mother parenting Children since their placement in their current foster home in June 2022.

Mother also testified. She described periods of dependency during her own childhood, her time in foster care, and her difficulties at school. Mother testified that, after CYF removed K.S. from her care, her battle with depression and physical health issues interfered with her ability to complete her court-ordered goals. In addition, Mother indicated that she has been hindered in

- 10 -

meeting her goals due to her having multiple attorneys and caseworkers during the history of the case. Mother stated that, following the filing of the termination petitions, she "lost hope" in ever reuniting with Children. *Id*. at 106. However, Mother highlighted her recent efforts to satisfy her court-ordered goals. She stated that the IPV counseling she began in July 2024 was "beneficial" and assisted her in "identifying . . . healthy versus toxic relationships." *Id*. at 124-25. Mother explained that she began mental health therapy in November 2024 and had attended three therapy sessions as of the date of her testimony at the January 23, 2025 hearing. She stated that her therapy has "been going really, really good," and she has "been able to . . . express [her] emotions about everything that's going on" during the sessions. N.T., 1/23/25, at 13.

Mother stated that in December 2024 she began renting the basement of her sister's house, which contains a bedroom, bathroom, and kitchen area. Mother indicated that her new housing is safe and secure "but it just needs a little bit of renovation." *Id*. at 11. Mother stated that she does not have a full-time job and she "do[es] hair and . . . make[s] bets on" an online betting platform for income. *Id*. at 12. Mother described a visit the day before her January 23, 2025 testimony as "amazing" and stated that Children were very affectionate with her. *Id*. at 23-24. Mother stated that she and Children "still have a bond" and termination of her parental rights would "hurt them." *Id*. at 31.

On January 27, 2025, the Orphans' Court entered the underlying orders terminating Mother's parental rights to Children, under 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). Mother filed timely notices of appeal, along with Pa.R.A.P. 1925(a)(2) concise statements of errors complained of on appeal. The court subsequently filed an opinion pursuant to Rule 1925(a). This Court consolidated the appeals *sua sponte*.

Mother presents the following issues for our review:

I. Whether or not the [Orphans' C]ourt erred and/or abused its discretion as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(1), (2), (5), and (8)?[4]

II. Whether or not the [Orphans' C]ourt erred and/or abused its discretion as a matter of law in conclusion that [CYF] met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of [Children] pursuant to 23 Pa.C.S.[A.] § 2511(b)?

Mother's Brief at 4.[5]

_____

[4] While Mother purports to challenge the Orphans' Court's decision under subsection 2511(a)(1), the court based its ruling to terminate Mother's parental rights only on subsections (a)(2), (5), and (8).

[5] Preliminary, we observe that Mother's counseled brief contains numerous defects that impede our review. Appellate briefs shall materially conform to the requirements of the Pennsylvania Rules of Appellate Procedure. **See** Pa.R.A.P. 2101. If the defects in a brief are "substantial," we may quash or dismiss the appeal. **Id**.

Mother's brief fails to comply with the Rules in numerous ways. Her brief lacks certain matters required in an appellant's brief, including the order under review and the summary of the argument. **See** Pa.R.A.P. 2111(a)(2), (6). In addition, Mother fails to include a single statement of the case, but

*(Footnote Continued Next Page)*

When reviewing a decree terminating parental rights, we

accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

---

rather she sets forth the factual and procedural history in various sections, with such headings as "Rationale," "Reasoning," and "Counter Statements of the Case." *See* Pa.R.A.P. 2111(a)(5); *see also* Mother's Brief at 16-20. These sections fail to present "a balanced presentation of the history of the proceedings," and instead include legal argument. Pa.R.A.P. 2117(b).

The argument section of Mother's brief is particularly deficient. She divides the argument into three parts, which do not correspond to the two issues set forth in her statement of questions. *See* Pa.R.A.P. 2119(a) (providing that the "argument shall be divided into as many parts as there are questions to be argued"). Furthermore, two of the issues Mother raises in her argument address dependency law irrelevant to this appeal, and Mother predominantly cites dependency caselaw in her brief. *See id*. (stating that the appellant shall include citations to "pertinent" authorities); *see also* Mother's Brief at 20, 22 (arguing that the Orphans' Court erred by finding that "reasonable efforts were made by" CYF and by terminating Mother's parental rights without finding that "separation [of Mother and Children was] clearly necessary"). Furthermore, Mother cites only boilerplate legal standards and fails to present *any* legal analysis in the argument section of her brief, as she appears to rely on the analysis presented in the earlier sections of her brief. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017) (stating that "this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority").

Notwithstanding these substantial defects in Mother's brief, we decline to dismiss or quash this appeal and address Mother's legal arguments to the extent we can discern them. We remind Mother's counsel of the obligations to strictly comply with the Pennsylvania Rules of Appellate Procedure when filing briefs in future cases.

- 13 -

> . . . [U]nlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in . . . termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Interest of K.T.*, 324 A.3d 49, 56 (Pa. Super. 2024) (citations omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*Id*. (citation and brackets omitted). To satisfy the clear and convincing evidence standard, the petitioner must present evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id*. at 56-57 (citation omitted).

The Orphans' Court determined that CYF met its burden to terminate Mother's parental rights under Section 2511(a)(2), (5), (8), and (b). We need only agree with the court's decision as to any one subsection of Section

- 14 -

2511(a), in addition to subsection (b), to affirm the termination of Mother's parental rights. ***See id***. at 57. Here, we examine the propriety of the court's ruling under subsections (a)(2) and (b), which provide:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * * *
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S.A. § 2511(a)(2), (b).

> Under Section 2511(a)(2), the petitioner must prove:
>
> (1) repeated and continued incapacity, abuse, neglect or refusal;
> (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and
> (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

***In re Adoption of L.A.K.***, 265 A.3d 580, 600 (Pa. 2021). Grounds for termination "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." ***Interest of K.T.***, 324 A.3d at 57

(citation omitted). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). A "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation omitted).

Mother first argues that CYF failed to prove that "any [parental] incapacity on her part was irremediable." Mother's Brief at 16. Mother asserts that the Orphans' Court "focused narrowly on [her] shortcomings without recognizing her overall progress" in complying with her court-ordered goals, including her completion of a parenting class and her enrollment in mental health therapy and IPV counseling. *Id*. She further avers that the court also failed to consider the "significant barriers" she faced, such as mental and physical health difficulties, transportation issues, and housing instability. Mother contends that termination of her parental rights was "premature" in light of her "sincere and ongoing efforts towards reunification," and she "requests additional time and continued services to allow her to complete her reunification goals." *Id*. at 10-11.

The Orphans' Court found that Mother demonstrated a repeated incapacity to provide Children with essential care, safety, and security throughout the history of the case. The court observed that Mother did not substantially comply with most of her reunification goals, including the goal that she achieve sobriety. The court found that "Mother's sobriety [was] a

reoccurring issue through the life of this case and there was no way to monitor it because she failed to complete the substance abuse programs to which she was referred." Orphans' Court Opinion, 3/17/25, at 28 (unnumbered).

While the Orphans' Court recognized the mental and physical health issues Mother faced during the case, the court determined that "Mother did not treat her court-ordered goals with the seriousness they deserved" and that her incapacity to meet her goals was "viewed in the same light as failing to do so." *Id*. at 28-29. The court found that Mother's recent participation in mental health therapy and IPV classes only occurred "at the final hour . . . when it was more convenient for her instead of when it would have benefited [C]hildren." *Id*. at 29. The court concluded that the evidence presented at the hearing showed that she was currently incapable of providing a safe and secure environment for Children. The court reasoned that "Mother's failure to engage with the programs she was referred to early and often demonstrates that she is not receiving the care that she needs in order for her to be a reliable and safe parent to" Children. *Id*.

Based on our review, we conclude the evidence supports the Orphans' Court's findings that termination of Mother's parental rights was appropriate under Section 2511(a)(2). *See Interest of K.T.*, 324 A.3d at 56. At the time of the court's ruling on the termination petitions, more than seven years had elapsed since K.S.'s removal from Mother's care and nearly five years had passed since K.B.'s removal. Yet, Mother remained substantially non-compliant with her court-ordered goals for reunification with Children. The

- 17 -

only goal Mother fully satisfied was her completion of a parenting class, and she did so in the month prior to the final hearing. Mother did not enroll in substance abuse or mental health programs despite numerous referrals from CYF over the history of the case. While Mother testified that she had recently begun engaging in mental health therapy, she had only engaged in three therapy sessions as of the date of her testimony. Similarly, Mother enrolled in IVP counseling within six months of her testimony, and there was no evidence she had completed the program.

Mother also failed to demonstrate that she consistently maintained adequate employment or housing, and she refused to engage with the in-home services provided by CYF. Additionally, while Mother regularly visited with Children early in the case and she progressed to unsupervised, overnight visits, the visits reverted to supervised in June 2021. From this point onward, Mother's visits with Children were sporadic, with her attending only seventeen of one hundred offered visits from June 2022 to June 2024. Indeed, the Juvenile Court found that aggravated circumstances existed in October 2023, based on Mother's failure to maintain substantial and continuing contact with Children. Accordingly, there was ample evidence that Mother had demonstrated a repeated and continued incapacity to provide essential parental care, control, or subsistence to Children. *See L.A.K.*, 265 A.3d at 600.

Furthermore, the Orphans' Court did not abuse its discretion in finding that Mother could not or would not remedy the causes of her incapacity. *See*

*id*. CYF presented multiple witnesses who described Mother's refusal to engage with the services offered and comply with the court-ordered goals for reunification. While Mother made some recent progress towards her IPV, parenting, and mental health goals, she did not begin to engage with services until more than one year after the filing of the termination petitions and after the first day of testimony. The court appropriately rejected Mother's belated efforts to cooperate as untimely. *See Z.P.*, 994 A.2d at 1117. Furthermore, while Mother requests more time to complete her reunification goals, the courts of this Commonwealth may "not subordinate indefinitely [Children's] need for permanence and stability to [Mother's] claims of progress and hope for the future." *In the Matter of M.P.*, 204 A.3d 976, 983 (Pa. Super. 2019) (citation omitted). As we find that the evidence supports the court's ruling with respect to subsection (a)(2), Mother's first issue merits no relief.

In her second issue, Mother argues that the trial court abused its discretion in finding CYF presented sufficient evidence for termination of her parental rights under Section 2511(b). The Section 2511(b) analysis considers the matter from the child's perspective and places the child's developmental, physical, and emotional needs over the concerns of the parent. *See Interest of K.T.*, 324 A.3d at 59. The trial court must consider the emotional bond between the parent and child, with the threshold for the bond inquiry being whether termination will sever a necessary and beneficial relationship. *See id*. at 59-60.

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care . . . ; whether the child is in a pre[-]adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

*Id*. at 59 (citation omitted).

Mother argues that the Orphans' Court failed to adequately consider her bond with Children. While she recognized that Dr. Bernstein was unable to perform a bonding assessment due to her failure to attend the interactional evaluation appointments, Mother maintains that the court should have inferred that a bond exists based on her efforts to maintain contact with Children. Mother specifically notes the testimony that K.S. had tantrums and outbursts when Mother failed to appear at a scheduled visit, arguing that this demonstrated K.S.'s attachment to her. In light of the significant emotional harm resulting from a permanent severance of the parent-child bond, Mother contends that Children's needs and welfare "would be better served by allowing Mother more time to complete [her] goals and reunite with" Children. Mother's Brief at 20.

The Orphans' Court found that the testimony of Dr. Bernstein and the caseworkers showed that Children had a "positive" relationship with their foster parents and they are "doing well in their placement." Orphans' Court Opinion, 3/17/25, at 31. The court noted that the foster parents are meeting all of Children's educational and medical needs and the foster parents have gone "so far as to get K.S. behavioral therapy of their own accord." *Id*. The

court further highlighted that Children were in "the most stable environment that they have experienced" and Children and the foster family have developed a mutual affection for each other. *Id*. On the other hand, the court recognized that CYF was unable to present a formal bonding assessment, as a result of Mother's missed appointments. However, the court found that to the extent a bond between Mother and Children continued to exist, "disrupting [Mother's relationship with the foster parents] would have more of an adverse impact on [Children] than terminating Mother's [parental] rights would." *Id*.

After careful review, we conclude that the record supports the Orphans' Court's determination as to Section 2511(b). *See Interest of K.T.*, 324 A.3d at 56. While there was evidence of a bond between Mother and Children earlier in the case, Mother has not maintained a consistent visitation schedule with Children since mid-2021. Indeed, Mother missed so many visits that the Juvenile Court found aggravating circumstances based on Mother's lack of substantial and continuing contact with Children. Dr. Bernstein opined that Mother's visitation attendance record demonstrated a "substantial absence" from Children's lives, and he explained that a parent's inconsistent, unexplained absences from a child's life will weaken the parent-child bond and "create stress for the child." N.T., 6/7/24, at 99, 135. While Mother points to K.S.'s tantrums and outbursts as evidence of a bond, K.S.'s behavior could equally reflect the stress Mother caused as a result of her infrequent engagement in her daughter's life. Moreover, Mother did not avail herself of the bonding assessment required by the Orphans' Court. Therefore, her

actions prevented the court from properly assessing whatever bond remained between her and Children.

By contrast, Children had been in their current foster home for more than two-and-one-half years at the time of the termination orders, and the foster parents are a pre-adoptive resource. The CYF caseworkers, foster care coordinator, and Dr. Bernstein each testified that the foster parents met Children's "myriad" needs and provide a loving, secure, and stable environment for Children. *Id*. at 100-01. Dr. Bernstein opined that Children have "an established bond" with the foster parents and their removal from that "safe[ and] loving environment" would negatively impact them. *Id*. at 104-06. In light of the foregoing, we discern no abuse of discretion or error of law in the court's conclusion that termination best serves the Children's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b).

For the foregoing reasons, we do not disturb the orders of the Orphans' Court terminating Mother's parental rights to Children.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE:  <u>9/4/2025</u>